UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| Emanuel Nicolescu | : | |
| | : | |
| Petitioner, | : | No. 3:15-cv-756-VLB |
| | : | |
| v. | : | |
| | : | March 10, 2021 |
| United States of America | : | |
| | : | |
| Respondent | : | |
| | : | |

**MEMORANDUM OF DECISION**
**<u>DENYING 2255 MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE</u>**

Before the Court is Emanuel Nicolescu's (the "Petitioner" or "Defendant")
motion to set vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255.
Mot., Dkt. 1.  Following a 2012 jury trial, the Petitioner was found guilty of two
counts of attempt to interfere with commerce by extortion in violation of 18 U.S.C.
§ 1951(a) and one count of possession of a stolen vehicle in violation of 18 U.S.C.
2313(a).  *United States v. Nicolescu*, 11-cr-24, Dkt. 144.  The Petitioner was
sentenced to be imprisoned for a total of 240 months on the extortion counts and
120 months on the stolen vehicle count, all terms to be served concurrently.  *Id.*
The Petitioner filed an appeal following this conviction, in which the Second Circuit
affirmed both the judgment and the sentence.  *United States v. Nicolescu*, 541 Fed.
Appx. 93 (2013).

The Petitioner now moves to vacate his conviction and states that his
motion is "entirely based on the ineffective assistance of counsel at trial, at
sentencing, and throughout the prosecution of the direct appeal."  Memo, at 2; Dkt.

1-2.  On the day Petitioner filed his habeas petition, he also filed a motion seeking discovery of certain items believed to be in the files of defense counsel, the Government, and law enforcement, and for the appointment of experts to review the evidence presented during his trial.  Disc. Mot., Dkt. 2.  The Government opposes both motions.  Dkt. 11.  The Government argues that the Petitioner has not established ineffective assistance of counsel and has failed to establish good cause for his discovery requests.  *Id.*  On October 30, 2020, the Court held an evidentiary hearing on the petition and the motions.  Ev. Tr., Dkt. 102.

After careful review of the substance of the pleadings and the evidence presented during the evidentiary hearing, the Court denies both of the Petitioner's motions for the reasons set forth below.

## I.      BACKGROUND

The underlying criminal case centered on a home invasion which began the night of April 15, 2007 and ended early on the morning of April 16, 2007.   The victims in this case are Anne Bass and Julian Lethbridge.  Also in the home, was Ms. Bass's young grandchild. Tr. at 100. Ms. Bass owned a large property in Connecticut, which she employed staff to maintain and operate.   Tr. at 81, 82–83, 829–30, 1007.

At trial, evidence was introduced about the features of the property, its day to day operations and security protocols that were commonly known the staff. Tr. at 147, 206, 211, 212, 837, 1015.  Three staff members testified that the property had poor cell reception, even after testing the reception with several different cell service carriers.  Tr. at 218, 798–99, 839.    Ms. Bass owned several vehicles,

including two Jeeps.  Tr. at 84.  The keys to these vehicles were kept in an unlocked box accessible to the household staff.  Tr. 207–08, 837.

During the day and into the evening of April 15, 2007, a nor'easter passed through southern Connecticut and New York City causing violent wind and heavy rain.  Tr. at 94, 264.  That evening, after the staff had completed all their chores and left the home for the day, Ms. Bass heard what sounded like war cries from three men who were wearing black clothes with black hoods.  Tr. at 1037.  The men were carrying guns and knives and were charging up the stairs towards Ms. Bass.  *Id.* The men grabbed Ms. Bass, dragged her into the living room and threw her on the floor.  Tr. at 1038.  The perpetrators then bound her wrist.  Tr. at 1039.  Shortly thereafter, the perpetrators grabbed Mr. Lethbridge and bound his wrists as well.  Tr. at 1040.

The home invaders forced Mr. Lethbridge and Ms. Bass to lead them to the bedroom and then the bathroom.  Tr. at 1041–43.  After the victims showed them the bathroom, the perpetrators forced the victims to sit in chairs in the bathroom and blindfolded them. Tr. at 1045.  Ms. Bass could hear odd noises, like snaps, clicks, and zips, which made her fear the home invaders were trying to blow up the house.  Tr. at 1046–47.  At the behest of one of the home invaders, Ms. Bass divulged the location and combination for her safe.  Tr. at 1051–52.

The blindfold over Ms. Bass's eyes was removed and she saw one of the perpetrators standing next to a table with a case on top. Tr. at 1055.  That perpetrator put on a pair of green rubber gloves, took out a syringe, went over to Mr. Lethbridge and injected something into his arm.  Tr. at 1055.  Then the

perpetrator injected Ms. Bass with a syringe.   Tr. at 1056.  The perpetrator told them the injection was a fatal virus that would kill them within 24 hours.  Tr. at 1057. He demanded $8.5 million in exchange for the antidote.  Tr. at 1057–58.  Ms. Bass informed him that she did not have access to that kind of money, and that she would have to go to her accountant who would be suspicious if she made such a request.  Tr. at 1059.  The perpetrators made her and Mr. Lethbridge drink an extremely bitter liquid, which Ms. Bass tried to spit out.  Tr. at 1061.  Mr. Lethbridge testified that over the course of the evening he heard crackling, which sounded like a walkie talkie.  Tr. at 129.  At some point thereafter, Ms. Bass told the perpetrators that her staff would be arriving for the day around 9:00AM.  Tr. at 1063.

After it became apparent that Ms. Bass did not have immediate access to $8.5 million, a plan was devised where Ms. Bass would have her accountant send considerably less money to Mr. Lethbridge, which the perpetrators would try to withdraw from his bank the next morning.  Tr. at 149–52.  The perpetrators then allowed Mr. Lethbridge and Ms. Bass to change their clothes so when they went to the bank, they would not appear suspicious.  Tr. at 151–52, 1067. After changing their clothes, Mr. Lethbridge and Ms. Bass were rebounded and made to lay down on the floor in the bathroom.  Tr. at 157, 1068–69.  Ms. Bass was unable to get comfortable, so one of the perpetrators picked her up and put her in her bed.  Tr. at 1069.  She fell asleep sometime between 4:00AM and 6:00AM.  Tr. at 1071.  Ms. Bass was awoken to the noise of her dog's collar chain.  Tr. at 1072.   When Ms. Bass felt that the perpetrators were no longer in her home, she got out of bed and was able to free herself from her restraints by using a pair of scissors.  Tr. at 1072.

4

She then freed Mr. Lethbridge, who called her private security company.  Tr. at 1073.  Police arrived a couple of hours later.  Tr. at 1073–74.  Ms. Bass, Mr. Lethbridge, and Ms. Bass's grandchild were taken to a hospital by an ambulance. Tr. at 1075.  Ms. Bass testified the home invaders bruised her arm and the Government introduced into evidence photographs of Ms. Bass's arm, which showed it was black at the injection site.  Tr. at 1086.

### A.  Investigation

After the home invasion, Connecticut police began their investigation by taking photographs of the crime scene and interviewing witnesses.  Two important pieces of evidence were discovered in the weeks following the invasion: (1) an accordion case that washed ashore on property abutting the Jamaica Bay in New York City and (2) one of Ms. Bass's Jeeps, which was abandoned in a New Rochelle Home Depot parking lot.

#### a.  Accordion Case

On April 21, 2007, a few days after the home invasion, Jean Johnson—who owns property along the shore of the Jamaica Bay in New York City—noticed an accordion case that had washed up and was lying in some mud along her property. Tr. at 260–67, 279.  It is common in this area for items from the bay to wash ashore into resident's yards, particularly after a bad storm.  Tr. at 291.  In the accordion case was a small crowbar, a gun, a stun gun, a laminated white card, some latex gloves, a knife, and three silver cylinders that had hypodermic needles in it with one needle having a blueish liquid in it.  Tr. at 269–71.  Ms. Johnson described the laminated card as containing various phone numbers, which she researched online

finding a common associated name of Bass.  Tr. at 272–73.  Ms. Johnson was aware of a recently published news article about the invasion at Ms. Bass's home and contacted police who took possession of the accordion case and its contents.  Tr. at 272–74, 285–86.  A detective with the New York Police Department identified the gun that was found inside the case as a BB gun that looked very real.  Tr. at 294. *See also* Tr. 405 (former Detective Valentin also believed the gun looked very real). Connecticut law enforcement traveled to New York to obtain the evidence collected from the Johnsons.  Tr. at 391–92.

### b.   Jeep in New Rochelle

As stated above, Ms. Bass owned two Jeeps at the time of the home invasion, one of which was a black 2006 Jeep Grand Cherokee that was purchased under the name of her farm in May 2006.  Tr. at 781–88.

On April 22, 2007, a loss prevention investigator with Home Depot contacted New Rochelle Police to inform them that a Black Jeep had been parked in the New Rochelle parking lot for approximately a week.  Tr. at 444–47.  The keys were in the ignition and the front windows were down.  Tr. at 447–48, 478.  That Jeep belonged to Ms. Bass.  Tr. at 524.  Home Depot turned over video surveillance showing the Jeep pulled into the parking lot at 7:06AM on April 16, 2007 to the Connecticut State Police.  Tr. at 450, 459–60, 484.  The investigator testified that the video depicts a light-colored SUV pull in next to the Jeep at approximately 7:09AM, but the view of the vehicles is obstructed because they were behind a school bus.  *Id.*  The video does not depict whether anyone got in or out of those vehicles because of the bus obstruction.  *Id.*  The investigator did not review then entire weeks' worth of video

surveillance and was unable to testify whether anyone touched the vehicle during that time.  Tr. at 465.  Connecticut law enforcement seized the vehicle, and its technicians took DNA samples.  Tr. at 528.

The Government called a lay witness, Mr. Daubney, who had 13 years of experience selling Cadillacs.  Tr. at 615–16.  For employment purposes. Mr. Daubney spent thousands of hours learning about GM make and models, which included Cadillac Escalades.  Tr. at 618.  The Government admitted through Mr. Daubney a picture of a 2005 Cadillac Escalade.  Tr. at 619.  Using this exhibit, Mr. Daubney explained the key features of a Cadillac Escalade; including its grill, headlight placement, pillars, rear lights, and taillights.  Tr. at 621.  In comparing the photograph and the Home Depot surveillance video, Mr. Daubney showed the features of the vehicle in the surveillance video that were consistent with the 2005 Cadillac Escalade; such as the window placement, headlights, grill, and taillight bulbs.  Tr. at 623–25.

### B. The Petitioner

The Government presented several pieces of evidence connecting the Petitioner to the home invasion; which included his connection to Ms. Bass and knowledge of Ms. Bass's Connecticut property, his connection to other persons of interest in the home invasion, his connection to the knife found in the accordion case, DNA evidence found on the Jeep that he could not be ruled out of, his connection to a Cadillac Escalade that was similar to the vehicle found in the New Rochelle Home Depot security video and EZ Pass records that were consistent with that Cadillac driving to and from the parking lot, cell phone data showing the

7

Petitioner's phone was used in the vicinity of the New Rochelle Home Depot around the time the Jeep was abandoned, and his pre-arrest flight.

### a. Connection to Ms. Bass

The Government presented evidence connecting the Petitioner to Ms. Bass and showing the Petitioner's familiarity with details about the operations at Ms. Bass's Connecticut property.  The Petitioner was a butler for Ms. Bass at her Connecticut property for about four weeks in April and May 2006.  Tr. at 799, 804, 826.  As the butler, he had access to one of two Jeeps owned by Ms. Bass.  Tr. at 801–02, 832.  The property general manager, Mr. Kuhn, told the Petitioner that he could not use the Jeep to go in and out of New York City for personal reasons.  Tr. at802.  After being told not to, the Petitioner used the Jeep in New York City and was involved in a car accident.  Tr. at 802–03.  The Jeep was totaled.  Tr. at 803.  A couple of days later, Ms. Bass told Mr. Kuhn to terminate the Petitioner and he did so.  Tr. at 804.  When the Petitioner was terminated, the Petitioner did not appear angry and was not seen at the property again.  Tr. at 819.  Mr. Kuhn could not remember whether he took the Petitioner's keys to Ms. Bass's property back from the Petitioner after the termination.  Tr. at 807.

### b. Connection to Mr. Kennedy

The Government presented evidence connecting the Petitioner to another suspected co-conspirator, Michael Kennedy, and evidence connecting Mr. Kennedy to the home invasions.  The Petitioner was indicted in February 2011 along with co-defendant Michael Kennedy.  *United States v. Nicolescu*, no. 11-cr-24, Dkt. 12.  The Petitioner and Mr. Kennedy were friends and former roommates.

Tr. at 429, 432.  The Petitioner's ex-wife testified that Mr. Kennedy and the Petitioner were best friends, having worked together around 1999 and 2000, having lived together from time to time, and having gone on yearly vacations to Romania together.  Tr. at 945, 948, 951, 957.  Mr. Kennedy's former roommate also testified that the Petitioner and Mr. Kennedy were close friends.  Tr. at 1156.

The Government presented evidence connecting Mr. Kennedy to the home invasion; including evidence placing Mr. Kennedy's vehicle near Ms. Bass's property on the night of the invasion', placing Mr. Kennedy in a position to drive the Cadillac to the New Rochelle Home Depot parking lot, connecting Mr. Kennedy to the accordion case, and showing Mr. Kennedy purchased walkie-talkies shortly before the invasion.

i.  Spotting of Kennedy's Car

The Government called two of Ms. Bass's neighbors, who testified that on the night of the home invasion they spotted a silver two-door car with Pennsylvania license plates parked on a road near Ms. Bass's property.  Tr. at 302–08.  One of the witnesses saw at least two people in the vehicle.  *Id.*  The other stopped next to the vehicle to speak with the occupants, when the driver stated that he was "just taking a piss" in broken English.  Tr. at 335.  That witness made a mental note of the license plate number, went home, and wrote down as much of the number as he could remember on a card.  Tr. at 336.  When that witness saw the news article about the invasion, he contacted police to provide a statement and the card on which he wrote the plate number.  Tr. at 336.  A detective with the Connecticut State

Police took a statement from the neighbors and the card with the plate number.  Tr. at 350–51.  The card read "PA 5057."  Tr. at 351.

The parties stipulated that Michael Kennedy had a gray 2001 Honda registered in Pennsylvania beginning in February 2007, which had a license plate reading GNV5057.  Tr. at 355–58.

On April 16, 2007 at 1:00AM, Mr. Kennedy called his then roommate, who could not remember the content of the conversation at the trial.  Tr. at 1136. Then at 2:00AM a tow truck driver was dispatched to pick up a silver Honda with license plate number GNV5057 driven by Michael Kennedy that was disabled at a gas station in Patterson, New York.  Tr. at 363–78.  This gas station is about 30 minutes south west of Ms. Bass's property.  The vehicle was towed to 69th Street in Queens, New York, which took approximately an hour and fifteen minutes.  Tr. at 380, 386. The Petitioner lived at 69th Street in Queens, New York at the time.  Tr. at 949–50. The car was not towed near Mr. Kennedy's residence, which was on 39th Road in Woodside New York.  Tr. at 1034–35.

ii. Kennedy's Connection to Accordion Case and Walkie-Talkies

Mr. Kennedy's father, Nicolae Helerea, testified that he is a professional accordion player and had many accordions in his home along with accordion cases.  Tr. at 420.  Mr. Helerea also testified that he gave Mr. Kennedy an accordion and a case for the accordion.  Tr. at 424. The Government presented evidence that on April 4, 2007, approximately a week before the home invasion, Michael Kennedy (also known as Nicolae Helerea) purchased walkie-talkies and AA batteries from a Sports Authority in Queens.  Tr. at 1162–63.

### c.  Connection to Knife found in Accordion Case

The Government also presented evidence connecting the Petitioner to one of the items found in the accordion case, the knife.  The Petitioner's former father-in law testified that in 2002 he gave the knife that was found in the accordion case to the Petitioner as a gift.  Tr. at 932–34.  His former father-in-law was able to make this identification with certainty because he made the knife and was able to identify certain features that were unique to the knife.  Tr. at 934.  The Petitioner's ex-wife also identified the knife found in the accordion case as the knife that her father gave the Petitioner as a gift.  Tr. at 958.

### d.  Connection to DNA on Jeep

The Government presented evidence connecting the Petitioner to DNA evidence collected from the Jeep, which was not the same Jeep he totaled while working for Ms. Bass.  The Jeep was swabbed for DNA and analyzed by Eric Carita, a DNA forensic expert with the Connecticut Department of Emergency Services and Public Protection, Forensic Science Laboratory.  Tr. 680.  On September 23, 2010, Connecticut police took a buccal swab from the Petitioner pursuant to a court order.  Tr. at 560–62.

There were two samples from the Jeep that the Petitioner "could not be eliminated from."  Tr. 704.  These came from the steering wheel and the windshield wiper lever, both inside the Jeep.  *Id.*  Mr. Carita testified that with respect to the Petitioner, "The expected frequency of individuals who cannot be eliminated as a contributor to the DNA profile at all loci or tests, except CSF1P0D2S1338 TPOX and D18S51, from that submission number 49 [the windshield wiper lever] is

approximately 1 in 1,595 in the African-American population, approximately 1 in 545 in the Caucasian population, and approximately 1 in 1,820 in the Hispanic population." Tr. 741. Mr. Carita further testified that with respect to the Petitioner: "The expected frequency of individuals who cannot be eliminated as a contributor to the DNA profile from that same submission number 45 [the steering wheel], at all loci or tests, except CSF1PO and D18S51, is approximately 1 in 5.3 million in the African-American population, approximately 1 in 990,000 in the Caucasian population, and approximately 1 in 3.9 million in the Hispanic population." Tr. 742–43.

Mr. Carita also testified that Mr. Lethbridge could not be eliminated from these samples as well. He testified that "[w]ith respect to J. Lethbridge, the expected frequency of individuals who could be a contributor to the DNA profile from submission number 49 [the windshield wiper] is approximately 1 in 885,00 in the African-American population, approximately 1 in 70,000 in the Caucasian population, and approximately 1 in 590,000 in the Hispanic population." Tr. at 741. He further testified that "[w]ith respect to J. Lethbridge, the expected frequency of individuals who cannot be eliminated as a contributor to the DNA profile from submission number 45 at all loci or tests, except D7S820 and D18S51, is approximately 1 in 2.4 million in the African-American population, approximately 1 in 175,000 in the Caucasian population, and approximately 1 in 1.2 million in the Hispanic population." Tr. at 742.

e.  **Connection to Vehicle Appearing at the New Rochelle Home Depot**

The Government also presented evidence at trial connecting the Petitioner to the vehicle that appeared in the New Rochelle Home Depot surveillance video pulling in next to the Jeep when it was abandoned.  The Petitioner worked as a driver for the Biskoff family between March 2007 and June 2007.  Tr. at 585, 602–03, 612–13. The Biskoff family owned a light tan colored 2005 Cadillac Escalade, which the Petitioner drove and was permitted to take home at night.  Tr. 587, 612. This vehicle was equipped with an EZ pass.  Tr. 587.  On April 16, 2007, one of the EZ passes registered to Mr. Biskoff was used on the Bronx Whitestone Bridge at 6:57AM heading from Queens to the Bronx. Tr. 641.   Then at 7:24AM the same EZ pass was used at the same bridge heading from the Bronx to Queens.  Tr. 642.   A case agent testified that the Whitestone Bridge is about 7.1 miles away from the New Rochelle Home Depot parking lot.  Tr. at 1243.

   f. Connection Between Phone and New Rochelle Home Depot

The Government also presented evidence showing the Petitioner used his cellphone within the vicinity of the New Rochelle Home Depot around the time the Jeep was abandoned.  At trial, the Government called an AT&T senior design engineer, through whom it introduced reports showing that the Petitioner was the listed account holder for a phone number ending in 5422 between 2005 and 2009. Tr. at 850–68.  The Petitioner's ex-wife testified that the phone number he used in 2007 ended with 422.  Tr. at 968.  This engineer reviewed cell phone tower records connected with this phone and found that at 7:16AM on April 16, 2007 the phone utilized a cell phone tower within the vicinity of the New Rochelle Home Depot to make a brief phone call to a voicemail.  Tr. at 877–80, 888, 892.

### g.  Pre-Arrest and Arrest Conduct

The Government presented evidence that shortly before the grand jury convened to review the 2011 indictment, the Petitioner booked a last-minute flight to Germany.  On September 23, 2010, law enforcement took a DNA sample from the Petitioner pursuant to a grand jury subpoena.  Tr. at 1249.  A little over a week later and the day before the grand jury was set to convene, on October 4, 2010 at 11:38PM, the Petitioner purchased a one-way ticket from New York to Frankfurt Germany that was scheduled to depart the next day.   Tr. at 1192–93, 1293.  Approximately four months later, on January 23, 2011, the Petitioner was arrested at a Chicago airport after getting off a flight from Romania to Chicago.  Tr. at 1250, 1292.

### C.  Conviction, Sentence, and Appeal

On March 22, 2012, the jury returned a verdict finding the Petitioner guilty of Count One: Attempt to Interfere with Commerce by Extortion, Count Two: Conspiracy to Interfere with Commerce by Extortion, and Count Three: Possession of a Stolen Vehicle.  *United States v. Nicolescu*, Dkt. 104.

On March 29, 2012, the Petitioner through his then counsel, Attorney Audrey Felsen, filed a motion for new trial and for judgment of acquittal pursuant to Rules 33 and 29 of the Federal Rules of Criminal Procedure.  *United States v. Nicolescu*, Dkt. 111.  The motion indicated that a memorandum in support of the motion would be filed within 30 days.  *Id.*  On March 30, 2012, Attorney Felsen filed a motion to withdraw her appearance indicating that the Petitioner retained new counsel, Attorney Erin O'Neil-Baker, to represent him moving forward.  *United States v.*

*Nicolescu*, Dkt. 113.  On April 2, 2012, Attorney O'Neil-Baker filed a motion to withdraw indicating that Attorney Gerald McMahon filed an appearance on the Petitioner's behalf.  *United States v. Nicolescu*, Dkt. 116.  Attorney McMahon filed a memorandum in support of the motion for a new trial and judgment of acquittal arguing that the federal courts did not have jurisdiction over this offense conduct because it was nothing more than a state robbery.  *United States v. Nicolescu*, Dkt. 130.  The District Court (Kravitz, J.) denied the motion, concluding that it saw "no reason to disturb the jury's determination that the Government proved the jurisdictional element of the Hobbs Act beyond a reasonable doubt."  *United States v. Nicolescu*, Dkt. 136 at 5.

Prior to sentencing, the Office of United States Probation drafted a presentence report ("PSR") to aid the Court in sentencing the Petitioner.  *United States v. Nicolescu*, Dkt. 121.  The PSR calculated the Petitioners total offense level at 40 and his criminal history category at I.  *Id.* at 18.  The Guidelines imprisonment range was 292 to 365 months.  *Id.* at 22.

Attorney McMahon filed a sentencing memorandum on behalf of the Petitioner.  *United States v. Nicolescu*, Dkt. 138.  The sentencing memorandum argued that: "In consideration of the unique circumstances of this case, including the aberrational nature of the offense conduct . . . , this Court should grant a downward departure from the applicable Guidelines range, or impose a non-Guidelines sentence, and sentence Emanuel Nicolescu to no more than 8 years [96 months] in prison."  *Id.* at 7.  Attorney McMahon also challenged the application of several United States Sentencing Guidelines enhancements.  *Id.* at 9–10.  Attorney

15

McMahon filed a reply memorandum further arguing that certain enhancements should not be applied.  *United States v. Nicolescu*, Dkt. 142.

On August 17, 2012, the Petitioner was sentenced to be imprisoned for a total of 240 months on Count One and Two, and 120 months on Count Three, with all terms to be served concurrently.  *United States v. Nicolescu*, Dkt. 144.

On August 24, 2012, the Petitioner entered a notice of appeal.  *United States v. Nicolescu*, Dkt. 146.  In his appeal, the Petitioner challenged the sufficiency of the evidence at trial to prove the "interstate commerce" element of the Hobbs Act convictions and the procedural reasonableness of the sentence imposed.  *United States v. Nicolescu*, Dkt. 170.  On January 22, 2014, the Second Circuit issued a summary order affirming the judgement.  *Id.*  The Second Circuit found that the Government offered sufficient evidence to satisfy the interstate commerce element of the Hobbs Act.  *Id.* at 4.  The Second Circuit also found that the sentence was reasonable and rejected each of the Petitioner's challenges to the Guidelines calculations.  *Id.* at 4–7.  Specifically, the Second Circuit found that (1) the District Court properly applied the organizer/leader enhancement under U.S.S.G. § 3B1.1(c), (2) the record was replete with evidence supporting the grouping approach utilized by the District Court, (3) the challenge to the demand enhancement was without merit, (4) it did not matter whether the district court erred in applying § 2B3.2 rather than § 2X1.1 in calculating the Hobbs Act extortion, and (5) there was ample evidence supporting the bodily injury enhancement under § 2B3.2(4)(A).  *Id.*

16

The Petitioner thereafter filed the instant motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255.  On August 14, 2018, the Petitioner filed a motion for the appointment of counsel.  Dkt. 24.  The Court granted this motion.  Dkt. 25.  The first appointed counsel filed a motion to be relieved of appointment due to a conflict between first appointed counsel and one of the attorneys who represented the Petitioner at trial.  Dkt. 29.  The Court granted the motion and appointed new counsel.  Dkt. 30.  Thereafter, the Petitioner filed letters with the Court seeking the appointment of substitute counsel.  *See* Dkt. 51 at 2.  The Court conducted a hearing on this motion where it advised the Petitioner of his rights and advised against self-representation.  *Id.* at 6.  The Court informed the Petitioner if it relieved his second appointed counsel, it would not appoint new counsel in his stead if Petitioner was the cause of the breakdown in the attorney-client relationship.  *Id.*  The Court found that Petitioner failed to show his attorney's representation was deficient and failed to show there was a legitimate reason for the Petitioner's lack of confidence in his second appointed counsel.   The Court relieved that attorney of his appointment.  *Id.* at 7.  The Petitioner filed a letter indicating that he still lacked confidence in counsel and understood this meant he would be proceeding pro se.  Dkt. 52.  The Court appointed stand-by counsel.  Dkt. 54.  The Court did not appoint another attorney because Petitioner failed to show substitute counsel would represent him in the manner Petitioner insisted, but did appoint standby counsel to help the Petitioner represent himself.

On October 30, 2020, the Court held an evidentiary hearing where the Petitioner represented himself with the assistance of stand-by counsel.  Ev. Tr.  At

the hearing, the Petitioner called Attorney Felsen and Assistant United States Attorney David Novick to testify.  The Petitioner's sole focus of the evidentiary hearing was whether a plea offer was ever made in this case prior to trial.

## II.    LEGAL STANDARD

Section 2255 enables a prisoner in federal custody to petition the federal court that imposed the sentence to vacate, set aside or correct the sentence.  28 U.S.C. § 2255(a).  "[C]ollateral attack on a final judgment in a criminal case is generally available under § 2255 only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in complete miscarriage of justice.'"  *Graziano v. United States*, 83 F.3d 587, 589–90 (2d Cir. 1996).  "The reasons for narrowly limiting the relief permitted under § 2255-a respect for the finality of criminal sentences, the efficient allocation of judicial resources, and an aversion to retrying issues years after the underlying events took place-are 'well known and basic to our adversary system of justice.'"  *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (citing to *United States v. Addonizio,* 442 U.S. 178, 184 & n. 11 (1979)).  Habeas review is an extraordinary remedy that cannot substitute an appeal, *Bousley v. United States,* 523 U.S. 614, 621 (1998), and may not be employed to relitigate issues that were raised and considered on direct appeal. *Cabrera v. United States,* 972 F.2d 23, 25 (2d Cir. 1992).

"This appeal is entirely based on the ineffective assistance of counsel at trial, at sentencing, and throughout the prosecution of the direct appeal."  Memo in Support of Mot. at 2; Dkt. 1-2.  "It has long been recognized that the [Sixth

Amendment] right to counsel is the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970).  A defendant challenging a conviction on the grounds of ineffective assistance of counsel must satisfy two components: (1) deficient performance and (2) prejudice.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

To establish deficient performance, the defendant must show "that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment."  *Id.*  Counsel's performance must have "fell below an objective standard of reasonableness."  *Id.* at 688. Whether counsel's performance was reasonable requires consideration of all the circumstances.  *Id.*  "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  *Id.* at 689.

A defendant must do more than raise vague, conclusory allegations of insufficient performance to establish deficiency.  *See Matura v. United States*, 875 F. Supp. 235, 237 (S.D.N.Y. 1995).  This is because "courts reviewing ineffective assistance of counsel claims are 'highly deferential,' and must 'strongly presume[ ]' that counsel 'made all significant decisions in the exercise of reasonable professional judgment.'"  *United States v. Rosemond*, 958 F.3d 111, 121 (2d Cir. 2020), *cert. denied,* No. 20-464, 2021 WL 78122 (U.S. Jan. 11, 2021) (citing to *Strickland*, 466 U.S. at 689–40); *Weingarten v. United States*, 865 F.3d 48, 52 (2d Cir.

2017) ("There is 'a strong presumption that counsel's conduct fell within the wide range of professional assistance.'").

Decisions that are based on reasonable strategy and judgment do not constitute deficient performance.  Defense counsel is faced with "any number of choices about how best to make a client's case." *Buck v. Davis*, 137 S. Ct. 759, 775 (2017).  "The lawyer has discharged his constitutional responsibility so long as his decisions fall within the "wide range of professionally competent assistance." *Id.* "If the attorney made a strategic choice after thoughtful consideration, that decision will be 'virtually unchallengeable.'" *Rosemond*, 958 F.3d at 121.  In some circumstances, defense counsel's decision not to challenge or to concede an element of the charged crime can be reasonable, particularly when there is overwhelming evidence establishing the existence of such element.  *See id.* Further, defense counsel's decision not to investigate can be found reasonable if, based on the totality of the circumstances, such investigation would be unnecessary, fruitless, or even harmful.  *Strickland*, 466 U.S. at 690–91.  However, "[r]elief may be warranted when a decision by counsel [to forgo an argument] cannot be justified as a result of some kind of plausible [litigation] strategy." *Weingarten*, 865 F.3d at 53.

Even if defense counsel's performance is found to be deficient, for a defendant to be entitled to relief from judgment it must show the error was prejudicial to the defense.  To establish prejudice, the defendant must show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687.  A defendant must do more

than simply show the error had "some conceivable effect on the outcome of the proceeding." *Id.* Rather, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

III.   ANALYSIS

A.   <u>Opportunity to Plead Guilty</u>

The Petitioner argues that "[Attorney] Felsen received at least one plea offer from the government yet she never presented it to me, never informed me of its terms, and instead repeatedly pushed, 'We have a very good chance of winning this case at trial." Memo. at 2. The Petitioner presented two pieces of evidence to support this argument. First, he presented an email from Attorney Novick to Attorney Felsen dated March 11, 2011, which contained initial guidelines calculations for the charges against the Petitioner. Dkt. 82-1. The email calculates the Hobbs Act offense as a total offense level of 34 before acceptance of responsibility and the Possession of Stolen Vehicle as a total offense level of 14, but because the offenses could be merged, he was looking at a Guideline range of 151 to 181 months without acceptance of responsibility and 108 to 135 months with acceptance of responsibility. *Id.* The email states that "Obviously, a final plea agreement would be subject to approval of my unit chief and the US Attorney." *Id.* Second, is an affidavit from co-conspirator Alexandru Nicolescu, who states that when he was meeting with the Government and law enforcement over a plea agreement they made to him when he was told he "should not make the same

mistake and Emanuel Nicolescu, he (Emanuel) being offered the same deal as me (Alexandru Nicolescu) but he 'went all in[]' which the detective would prefer that I would not have the same 20 years sentence . . . ."  Mot. at Ex. E.

The Government objects, arguing that it never made a plea offer.  Rather, at most, all that was provided was an initial guidelines calculation.  The Government provided an affidavit from Attorney Felsen, who attests that the Government never provided a written plea agreement.  Gov.'s Opp. at Ex. 2, ¶ 4 (Felsen Aff.).

The Government further argues that the Petitioner has not established prejudice because he never would have accepted the offer.  The Government offered evidence that Petitioner would not have accepted a plea offer because he maintained his innocence through the trial and appeal and would not have accepted a plea offer in the range prescribed by the Guidelines.  The Government provided Attorney Felsen's affidavit where she states that the Petitioner "insisted he was innocent," and "maintained this position throughout the course of the proceedings." Felsen Aff. at ¶ 4.  In further support of the lack of prejudice, Attorney Felsen's affidavit stated Petitioner "made it clear on multiple occasions that he would not consider and did not want to discuss any kind of plea agreement that did not provide for a definite sentence of less than four years*." Id.*

The sole focus of the evidentiary hearing was whether a formal plea offer was ever made in this case that Attorney Felsen failed to provide the Petitioner. Ev. Tr.  At the hearing, AUSA Novick testified that he did not make any plea offers in this case.  Ev. Tr. at 79.  Attorney Felsen testified at the evidentiary hearing that she did not received any plea offers in this case.  Ev. Tr. at 8.  Attorney Felsen

further testified that there were no discussions about requesting a plea offer because "at the time . . . [the Petitioner was] proclaiming factual innocence and indicating [he] wanted to go to trial."  Ev. Tr. at 12.  Further, Attorney Felsen testified that she did not seek a plea offer because the Petitioner indicated "he would only plead under very specific circumstances," which she explained to the Petitioner she was unable to achieve because he was seeking an offer for a definite sentence.  Ev. Tr. 9, 14, 27, 64. *See also* Ev. Tr. at 37 ("[He] told me [he] would not accept" a non-definite sentence offer.).  Attorney Felsen credibly testified that she stopped discussing the option of a plea agreement because the Petitioner "made clear that [he was] innocent and that, at the time, it was [his] opinion that it was an easy case to prevail upon."  Ev. Tr. at 31.

The Petitioner testified that he wanted to plead guilty. Ev. Tr. at 117.  The Court does not find this testimony credible.  He has never been willing to admit guilt.  Throughout the proceedings, to and including his last appearance before the Court at his habeas hearing, Petitioner consistently maintained his innocence. Ev. Tr. at 145.  Even if he wanted to plead guilty, he did not express such desire to his counsel; to whom he indicated he would only plead guilty to a definite sentence of four years.  Ev. Tr. at 114.  After the Court explained that in order to plea guilty he would have to confess guilt,  he was asked whether he would have lied in order to plea guilty; to which he testified that "maybe [he] would have."  Ev. Tr. at 144.  When asked "you just said that you would lie to get a shortened sentence; is that true?"  Ev. Tr. at 145.  He testified: "Probably."  *Id.*  Though he shortly thereafter said the reverse, the Court finds his first admission to be truthful.  The Petitioner was willing

to lie to get a shorter sentence, meaning he is willing to lie now in order to get habeas relief.  Thus, the Court does not find credible the statements the Petitioner made during the evidentiary hearing that were contradicted by other evidence.  Alternatively, his ambivalence towards admitting guilt after sentencing suggests he was adamant against it before sentencing.  The Court finds Petitioner was never willing to and never expressed a willingness to plead guilty.

With respect to the March 11 email, AUSA Novick testified that this was not a plea offer and that he was "not agreeing to anything," rather he was "giving Ms. Felsen a sense of [his] rough initial guideline calculation to assist her in her discussions with [the Petitioner] . . . ."  Ev. Tr. at 81–82.  Attorney Felsen also testified that this email was not a plea offer.  Ev. Tr. at 58.  She further testified that she did not show this email to the Petitioner.  Ev. Tr. at 14.  But she did provide the Petitioner with her calculation of what his Guidelines range would be.  Ev. Tr. at 15, 21.

The right to the effective assistance of counsel applies to the plea-bargaining process.  *Missouri v. Frye*, 566 U.S. 134, 144 (2012).  "[A]s a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused."  *Id.* at 145.  Failure to do so establishes the first *Strickland* factor, that counsel's performance was deficient.  To satisfy the second prong,

> a defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (*i.e.,* that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's

terms would have been less severe than under the judgment and sentence that in fact were imposed.

*Lafler v. Cooper*, 566 U.S. 156, 164 (2012); *see also Frye*, 566 U.S. at 147 ("To show prejudice . . . Defendants must demonstrate a reasonable probability they would have accepted the earlier plea had they been afforded effective assistance of counsel.").

There must be a plea offer for an ineffective assistance of counsel claim to arise under *Lafler* and *Frye*. "[I]f no plea offer is made, or a plea deal is accepted by the defendant but rejected by the judge, the issue raised here [of ineffective assistance of counsel] simply does not arise." *Lafler*, 132 S. Ct. at 1387; *see also Murph v. United States*, 12 F. Supp. 3d 557, 572 (E.D.N.Y. 2014) ("there can be no ineffective assistance of counsel claim if, as here, there is no actual plea offer that, but for the attorney's deficient assistance, would, with reasonable probability, have been accepted by the Defendant").

Here, the Court finds that the best way to interpret the Government's March 11, 2011 email is as a *Pimentel* letter.  In *United States v. Pimentel*, the Second Circuit advised the Government to provide defendants with an estimate of "the likely range of sentences that their pleas will authorize under the guidelines" to help "ensure that guilty pleas indeed represent intelligent choices by defendants." *United States v. Pimentel*, 932 F.2d 1029, 1034 (2d Cir. 1991). At least one court in a sister district has held that a "Pimentel letter [is] not a plea offer." *Rodriguez v. United States*, No. 09 CR 58 NRB, 2013 WL 3388223, at *7 (S.D.N.Y. July 8, 2013).

The *Pimentel* letter at issue here is not a plea offer.  The Government identified the March 11 email as an "initial guidelines calculation." It is by its terms

not a final calculation and therefore it could not be an offer. The email only describes the calculation of the Petitioner's sentence with and without the acceptance of responsibility.  It does not provide the standard plea agreement language explaining the Petitioner's rights.  Further, the email includes language indicating that the sender lacked the authority to offer a plea and could not make a plea offer without authorization from the unit chief and US Attorney.   The Court takes judicial notice of plea agreements in 2011 and 2012, which are consistent with present plea agreements in federal cases, that indicate in the agreement itself that the agreement is being made on behalf of the United States Attorney.  By inference, an agreement made on behalf of the United States Attorney requires that official's approval.  *See* Dkt. 89-4 (plea agreement with Alexandru Nicolescu with then United States Attorney Deidre Daily listed in the signature area).  The then requirement that formal plea offers be approved by supervisory AUSAs or the United States Attorney is consistent with current Department of Justice policy that plea agreements are to be approved by supervisory AUSA's.  *See* Department of Justice Manual, Principles of Federal Prosecution § 9-27.450 (updated Feb. 2018), available at: https://www.justice.gov/jm/jm-9-27000-principles-federal-prosecution#9-27.450.

Nor is there any evidence that the victims were notified, pursuant to the Crime Victim's Rights Act, 18 U.S.C. § 3771(a), of any plea bargain.  While victim notification is not dispositive on the issue, it supports the conclusion that a plea offer was not made.

Further, the email does not include any terms that would indicate it is an offer, such as "offer."  Nor can a reasonable person interpreting this letter believe that Attorney Felsen could have responded "he will accept" and thus create a binding agreement.  The March 11, 2011 email is not a formal plea offer.  The Petitioner has presented no other evidence that a plea offer was made in this case.  Thus, the Petitioner is unable to established deficient performance because he has not established that a plea offer was made.

Attorney Felsen's performance was not deficient because she made the strategic choice not to pursue a formal plea offer.  *Rosemond*, 958 F.3d at 121.  Attorney Felsen testified she did not pursue a plea offer because the Petitioner insisted he would not accept a plea offer in the Guidelines range that AUSA Novick stated was applicable in this case.   Attorney Felsen did not want to precipitate a breakdown of the attorney-client relationship.  Had she pursued a formal offer, she would have had to present it to Petitioner and risk destroying his confidence in her by seemingly pressuring him to plead guilty to a crime he insisted he did not commit  and accept a prison sentence he said he would not accept.   Attorney Felsen, faced with a Hobson's Choice, chose to pursue the course of defense her client insisted upon.  Ev. Tr. at 12.  Attorney Felsen's strategic decision to pursue the trial strategy on which her client insisted after broaching the subject of a plea was not ineffective.  On the contrary, it honored her client's sixth amendment right to participate in his defense. See *Hawkins v. Costello*, 460 F.3d 238, 243 (2d Cir. 2006) (citing to *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)).

Even if the Petitioner was able to establish deficient performance, he has not established prejudice.  The evidentiary hearing testimony showed that the Petitioner was only willing to enter into a plea agreement that included a definite sentence of four years.  The Petitioner has provided no credible evidence showing he would have accepted the terms of the March 11, 2011 email if they were presented as a formal plea offer.

Therefore, the Petitioner has not met his burden in establishing ineffective assistance of counsel with respect to the alleged failure to communicate a formal plea offer because he has not established the existence of a formal plea offer, nor has he established that he would have accepted such an offer.

### B. DNA Evidence

The Petitioner raises several claims that his defense team[1] failed to adequately challenge the DNA evidence in this case.  First, he argues that his defense should have called their own witness to address the evidence.  Second, he argues that his defense should have presented evidence about alleged errors associated with the lab that conducted this DNA testing.  Third, he argues that his defense failed to present evidence/argument about the limitations associated with mixed and partial DNA, that the samples connected to the Petitioner were more strongly connected to Mr. Lethbridge, about the weakness of the expected frequency theory, and about the sensitivity of DNA when exposed to changes in

---

[1] At trial, the Petitioner was represented by Attorney Felsen and Attorney Koffsky. The Court will refer to both attorneys as the "defense team."

temperature, humidity, and light.  Fourth, he argues that his defense looked foolish when confusing mitochondrial DNA and nuclear DNA.

The Petitioner attached an unsigned document purporting to be an affidavit. The document states that the DNA evidence presented was insufficient to be connected to him; this affidavit does not list who the affiant is, what their qualifications are, nor is it executed.  It appears the Petitioner has provided this affidavit in hopes that the Court would appoint an expert who will sign off on the affidavit he drafted opining to his unqualified conclusions.

He has also provided an article entitled "Transfer Theory in Forensic DNA Analysis," an article entitled "New DNA testing may free convicted Colorado rapist, killer," and a report from a National Commission on the Future of DNA Evidence working lunch.  In addition, the Petitioner cites to a District of Columbia case, which discusses when the FBI uses certain frequency terminology, such as "cannot be excluded as a potential contributor of the sample" as occurring only when the unknown sample is smaller than 1 in 280 million.  *United States v. Marrow*, 374 F. Supp. 2d 51 (D.D.C. Apr. 25, 2005).  He argues that his defense should have used this information to impeach the DNA expert.  He does not link these materials to his case in any crucial way.  He does not state these materials were extant at the time his defense was being prepared or how they would have changed the outcome of his trial had they been presented or used.

The Government argues that the defense vigorously cross-examined the DNA expert.  The Government also argues that the defense took reasonable steps to prepare to address the DNA evidence; pointing to Attorney Felsen's affidavit

where she discussed seeking guidance from other defense attorneys who are versed in DNA evidence, speaking with the Government's witness directly, and retaining her own DNA expert.  Felsen Aff. at ¶6. The Government argues that the decision not to call her expert was a strategic choice because his testimony would not have been helpful.  Further, the Government argues that the Petitioner's claim about the errors with the DNA lab is unsupported by evidence.  Lastly, the Government argues that the Petitioner fails to demonstrate prejudice.

Here, the Court finds the Petitioner has failed to show that defense counsel's handling of the DNA evidence fell below the standard of reasonableness.  The decision not to call a DNA expert was strategic because, as stated in Attorney Felsen's affidavit, this "would not be beneficial, and in fact would be harmful." Felsen Aff. at ¶ 6.  By not calling an expert, who by inference would likely have corroborated in significant respects the conclusions reached by the Government's expert, she avoided the duplicity of evidence against the Petitioner and avoided the further discussion about evidence harmful to the defense.  It was reasonable for Attorney Felsen to not call a second DNA expert who would have been detrimental to the defense.  The Petitioner has provided no claims whatsoever that a second expert would have been helpful to his defense.  Thus, the defense team was not deficient in failing to call a DNA expert of their own.

The Petitioner has not met his burden in proving defective performance for failing to present alleged DNA lab failures because he has failed to show that such errors even exist.  He has provided only vague and conclusory claims that there were such errors.

30

The Petitioner has also not met his burden in proving defective performance for failing to vigorously cross-examine the Government's DNA expert because the Court finds that the defense team vigorously cross-examined the DNA expert.  On cross examination, the defense elicited testimony that left the impression that the efforts taken in the lab to avoid contaminating a DNA sample were not present in the Jeep, which was left in a New Rochelle Home Depot parking lot with the windows down for a week.  Tr. at 753–58.  Defense counsel elicited testimony that showed how little Mr. Caritas knew about the circumstances in which the Petitioner's DNA could possibly get on the steering wheel and windshield wiper lever.  Tr. at 759–60.  Defense counsel also elicited testimony that called into question why only the steering wheel and windshield wiper lever would possibly have the Petitioner's DNA and not the gear shaft, the center console, and other areas within the drivers reach.  Tr. at 761–63.  In addition, defense counsel elicited testimony showing that Mr. Caritas did not obtain DNA samples from four of the investigators known to have had some contact with the vehicle during the investigation.  Tr. at 765–66.

The Petitioner has not met his burden in proving defective performance for failing to present the various claims he now argues should have been raised because he has not shown why such claims would have been helpful to his defense, much less outcome determinative,  and because some of those claims were indeed raised.  First, the claim that defense counsel should have presented evidence associated with the limitations of mixed and partial DNA is unsupported by any evidence in the record that such evidence exists and that such evidence

would have been helpful in his defense.  Second, the claim that defense counsel should have presented evidence that the DNA was a closer match for Mr. Lethbridge is in conflict with the record showing that such evidence was elicited during trial, *albeit*, through the Government's direct examination and not defense counsel's cross examination.  *See* Tr. at 741 (testifying the expected frequency of individuals who cannot be eliminated as a contributor to the DNA profile of sample 49 for Mr. Lethbridge was 1 in 70,000 Caucasians and for the Petitioner 1 in 545 Caucasians).    Third, the claim that defense counsel should have challenged the frequency ratio evidence is unsupported by the record.  Mr. Caritas testified at trial about the frequency ratios upon which he relied and how that applied in layman's terms.  Tr. at 696–701.  The Petitioner has presented no evidence that what Mr. Carita's testified to was false or misleading.  The Petitioner's citation to *Morrow* is meritless because *Morrow* involved terminologies used by a different lab than the lab that conducted the DNA testing in this case.  374 F. Supp. 2d at 59.  Lastly, the claim that defense counsel should have challenged possible degradation of the DNA sample fails because counsel did elicit testimony about how the DNA could have degraded over time.

The Petitioner has not met his burden in showing that defense counsel looked foolish in confusing mitochondrial DNA and nuclear DNA because there is no evidence of such a confusion.  The distinctions in the types of DNA came into the trial when defense counsel was cross-examining the DNA expert and eliciting testimony about the extreme cautionary measures that are taken when examining DNA in the lab.  This testimony was juxtaposed with the conditions that the Jeep

was in during the week it was parked in the New Rochelle Home Depot parking lot with its windows down.  This line of questioning showed that the DNA in the Jeep was not exposed to the same cautionary measures exercised in a lab.   In eliciting this testimony, defense counsel directly questioned the expert about a DNA test he directly observed in a separate case.  Tr. at 753.  The testing he observed involved mitochondrial DNA.  This case involved nuclear DNA.  There is no evidence that defense counsel confused these types of DNA.  He was merely eliciting helpful testimony by using his personal firsthand experience to a similar but different DNA analysis.   There is no evidence he looked foolish as the Petitioner claims. Regardless, even if he looked foolish, that does not establish his performance was so deficient that it would be deemed unreasonable.

The Petitioner cannot establish that, even if counsel performed the way he claims they should have, he was prejudiced.  The DNA evidence, like so many other pieces of evidence in this case, was a single piece of a much larger puzzle that shows the Petitioner was a conspirator in the home invasion.  These pieces of evidence include his connection to Ms. Bass, his connection to the knife found in the accordion case, his connection to a vehicle matching the description of the vehicle that appeared at the New Rochelle Home Depot, his connection to the co-defendants in this case, his connection to the EZ Pass that corresponds with being in the area of the New Rochelle Home Depot around the time the Jeep was abandoned, his cell phone record putting him in the vicinity of the New Rochelle Home Depot around the time the Jeep was abandoned, and his post-DNA swab flight out of the country.  The Petitioner has challenged almost every piece of

evidence in this case that connects him to the home invasion and argues that when that evidence is undermined due to ineffective assistance of counsel in groups, he can establish prejudice.  As explained in greater detail below, the Court rejects all arguments alleging ineffective assistance of counsel relating to the pieces of evidence connecting him to the home invasion.  Therefore, because all the other evidence against him withstands his claims of ineffective assistance of counsel, he cannot establish how even the removal of the DNA evidence in this case would undermine confidence in the outcome.

**C. Accordion Case Evidence**

**i.      Accordion Case/ "Home Invasion Kit"**

The Petitioner raises two claims of ineffective assistance of counsel relating to the accordion case and its contents; to which he refers to as the "home invasion kit."  First, the Petitioner argues that Attorney Felsen failed to ensure that the jury understood the incredulous nature of the home invasion kit evidence; specifically focusing on the laminated card contained therein.  He contends that this tends to prove that the accordion case was "fake."  The Petitioner further argues that Attorney Felsen should have called an expert to testify about the "likelihood that this 'home invasion kit' was the real thing or fake."  Second, the Petitioner argues that Attorney Felsen should have had Ms. Bass and Mr. Lethbridge identify the items that were in the accordion case as the items that they observed on the night of the invasion.

The Government argues that the Petitioner's post hoc analysis of his counsel's performance offers no legitimate critique and no explanation of how the

trial would have turned out different if these alleged deficiencies were corrected. The Government further states that even if there was an expert that could or would testify that the accordion case was "fake," such testimony would not have been admissible because it usurps the role of factfinder.

The Court finds that the Petitioner has failed to meet his burden in showing that his defense's performance was deficient in handling accordion case evidence. First, with respect to the presence of the laminated card, it was not unreasonable or even incredulous that the accordion case contained said card.  Witnesses at the trial testified that Ms. Bass kept these cards throughout her home, which is the same home where Petitioner worked and that the accordion case which washed-up on the shore with his custom-made knife inside was in during the home invasion.   Tr. at 58, 195–96.   To discredit the circumstances relating to the accordion case, the defense would have had to give the accordion case even more attention than it otherwise had.  Because there was other evidence supporting the circumstances that show the accordion case evidence was not "fake"—such as the connection between Kennedy and accordion cases, the syringes contained therein, the sleeping pill container, the gun, and the knife—this only would have given the jury more time to examine evidence that was harmful to the Petitioner.   The Petitioner has presented nothing showing whether an expert would have deemed the accordion case evidence was fake, or even that such an expert exists.   The Petitioner cannot rely on the mere possibility of the existence of some evidence to support his claim of ineffective assistance of counsel.

The Court also rejects the Petitioner's claims that the defense team should have had the victims identify the items in the case as the items they observed on the night of the invasion.  The Petitioner has presented nothing showing that the victims would have testified that the items in the accordion case were not the same items they witnessed in the invasion.  Rule of witness examination 101, which every law student learns, is never ask a question the answer to which you do not know. If the defense team had the victims identify these items and the victims identified the items as those used in the invasion, this would have been even more damaging evidence against the Petitioner.  Particularly because his custom made hunting knife, which had been positively identified, was in the accordion case that washed up in the area not far from his home.  It was reasonable trial strategy to not home in on damaging evidence when there is no direct evidence against it.  The Petitioner cannot rely on his vague and conclusory allegations that the failure to further challenge this evidence was ineffective.

Therefore, the Court finds that the Petitioner has failed to show that his defense team was ineffective in the way they addressed the accordion case evidence.

ii.      Knife Identification

The Petitioner raises three claims of ineffective assistance of counsel relating to the knife identification evidence.  First, the Petitioner contends that he informed Attorney Felsen that the hunting knife looked similar to the knife made by his father-in-law and that only after he told Attorney Felsen this, did the Government start asking his ex-wife and former father-in-law about the knife.  He

states that he is confident that Attorney Felsen told the Government about the knife in violation of the attorney-client privilege.  Second, the Petitioner argues that Attorney Felsen should have (1) conducted a line-up of hunting knifes at trial and required his former father-in-law to identify the knife and (2) called an expert witness to impeach his father-in-law's identification.  Third, the Petitioner argues that Attorney Felsen "missed entirely" his ex-wife's testimony that the knife "never went missing," and that she should have explored this to impeach his former father-in-law's identification.

The Government argues that the Petitioner presents no evidence that Attorney Felsen alerted the Government and law enforcement to his connection to the knife found in the accordion case.  Further, the Government argues that the Petitioner has not shown how any lineup or expert witness would have impeached his father-in-law and ex-wife's identification of the knife found in the accordion case.  Lastly, the Government argues that the Petitioner mischaracterizes his ex-wife's testimony about the knife "never going missing."  She did not testify affirmatively that the knife was not missing.  She testified that she did not realize the knife was missing but it was in a room she rarely entered on a shelf with other objects.  A more accurate interpretation of her testimony was that she would not likely have known if it was missing.

The Court finds that the Petitioner has failed to meet his burden in showing that his defense team was ineffective in addressing the knife identification evidence.  The Petitioner's argument relating to the alleged violation of the attorney-client privilege is purely speculative and devoid of any factual predicate.

What is more, it appears to suggest he admitted to Attorney Felsen he had some connection to the knife.  The Petitioner has presented no evidence that Attorney Felsen breached the attorney-client privilege other than his own belief that she did. At the evidentiary hearing, the Petitioner did not question either Attorney Felsen or AUSA Novick about the circumstances related to the discovery of the connection between the knife and the Petitioner.  The Petitioner's self-serving claims that this happened, which again is unsupported by any evidence, does not provide a basis for the Court to conclude such event occurred.

The Court also rejects the Petitioner's claims that counsel was deficient for failing to conduct a line-up or obtain a knife expert to impeach his former father-in-law.  He has presented no evidence the testimony of his former father-in-law and ex-wife was impeachable. On the contrary, there was ample evidence supporting this identification.  The former father-in-law made the knife and intentionally gifted it to the Petitioner, thus a reasonable jury would conclude he would be in an extraordinary position to identify whether the knife he crafted with his own hands and gifted was the knife fond in the accordion case.  Further, the Petitioner's ex-wife identified the knife as the knife her father gave the Petitioner.  If Attorney Felsen conducted the lineup and his former father-in-law and ex-wife were able to positively identify the knife as the Petitioner's, this would have further cemented in the minds of the jury that the knife in the accordion case was indeed the Petitioner's.  This would have been harmful to the defense.  Thus, it was reasonable trial strategy to not attempt to elicit testimony that could have been harmful to the Petitioner. Petitioner merely speculated that this strategy would have been

beneficial to his defense.   Counsel's performance is not deficient because a wholly speculative and likely harmful line of defense was not pursued.

The Court also rejects the Petitioner's claims that Attorney Felsen "missed entirely" his ex-wife's testimony about the knife.   As stated above, the Petitioner has mischaracterized his ex-wife's testimony.   She testified that she couldn't "remember seeing it missing."   Tr. at 987.   Defense counsel made the most of her testimony   by repeatedly eliciting her testimony that she could not say it was missing:

> Q. And you don't remember ever seeing it go missing?
> A. I don't remember seeing it missing.
> Q. You don't ever remember ever noticing it missing or not on that shelf or going to look for it?
> A. No.
> Q. Or discussing it?
> A. I don't remember ever discussing it or seeing it missing or noticing that it's gone.

Tr. at 986–87.   Defense counsel effectively elicited the most helpful testimony they could from this witness and did so repeatedly.   It cannot be said that they "missed" this evidence or failed to exploit it to the Petitioner's advantage.   Thus, counsel was reasonable in handling the evidence that the Petitioner's ex-wife could not remember seeing the knife go missing.

Therefore, the Court finds that the Petitioner has failed to show that his defense team was ineffective in the way they addressed the knife identification evidence.

D.  Cadillac Testimony

The Petitioner argues that the defense team was ineffective in failing to impeach the Government's lay witness who testified that the vehicle he saw in the

Home Depot security video was a Cadillac Escalade.  He argues that this testimony was incredulous and the result of influence by law enforcement, who only requested this witness consider whether the vehicle was a Cadillac Escalade. Further, the Petitioner claims that in the beginning of the investigation, it was believed this vehicle was a Toyota or a Nissan and the defense team should have called a witness from Las Vegas who did not conclude that the vehicle was a Cadillac Escalade.

The Government argues that Attorney Felsen did challenge the testimony of Mr. Daubney both orally; Tr. at 495; and in a written motion in limine; Ex. 3; both challenges she lost.  The Government also argues that Attorney Felsen tried to get the police report—showing that the initial suspicion was that the vehicle in the video was a Toyota or Nissan—admitted but the court prohibited her from doing so.  Tr. at 1278.  Further, the Government argues that, even if there was a witness who was willing to testify that the vehicle was something other than a Cadillac Escalade, there would have been a battle of the witnesses where the Government's witness would have prevailed due to the EZ pass records putting that vehicle within the vicinity of the Home Depot parking lot at the time.

The Court finds that the Petitioner has failed to establish that his counsel was ineffective in their handling of the Cadillac Escalade evidence.  Contrary to the Petitioner's claim, the defense did cross-examine the Government's witness and showed the inherent bias that the jury could have considered in calling into doubt the veracity of the witness's testimony.  For example, defense counsel repeatedly elicited testimony that law enforcement sought the witness out because he was a

Cadillac dealer.  Tr. at 626–27.  Further, the defense elicited testimony showing that law enforcement did not conduct a forensic analysis of this video, which leaves the impression that the Government did not try to determine what the vehicle in the video actually was after they had a witness who was willing to say it was a Cadillac. Tr. at 627–28.  This cross-examination was reasonable.

The Petitioner has not shown the investigator's first impression of the make and model of the vehicle in the video would have had any effect on the outcome of the case.  This is because there is no evidence the police officers had any expertise in the identification of Cadillacs, Toyotas, or Nissans.  Mr. Daubney's testimony was not simply his opinion that the vehicle was a Cadillac Escalade, rather through him the Government showed the jury a photograph of a Cadillac Escalade, pointed out its features and pointed out the features in the surveillance video that were consistent with a Cadillac Escalade.  It was the jury's role to compare the picture of an actual Cadillac Escalade with the video.  There is no evidence presented that any other vehicle would have looked more similar than the vehicle showed by Mr. Daubney.

The Court also agrees with the Government, that even if there was a witness willing to testify that the vehicle in the video was a Toyota or Nissan, this testimony would not undermine confidence in the outcome of the case. Mr. Daubney's identification of the vehicle is supported by the EZ pass records showing the Cadillac Escalade, which was within the Petitioner's control at the time, was in the vicinity of the Home Depot parking lot at the time the Jeep was abandoned. Regardless, the Petitioner has presented no evidence that any such witness exists.

The Petitioner cannot meet his burden of proof with conclusory claims that such evidence could possibly exist that may or may not show ineffective assistance of counsel.

Therefore, the Court finds that the Petitioner has failed to show that his defense team was ineffective in the way they addressed the Cadillac Escalade evidence.

E. **Witness Credibility**

The Petitioner argues that his defense team was ineffective in failing to impeach the testimony of the victims in this case.  First, the Petitioner argues that the defense should have solicited testimony relating to a Singapore court's finding that Ms. Bass was not credible.  Second, the Petitioner argues that the defense should have ensured the jury noticed the conflicting evidence between Ms. Bass and Mr. Lethbridge about the appearance of the assailants.  Lastly, the Petitioner argues that the defense failed to impeach Ms. Bass's trial testimony that one of the assailants had blue eyes, which was not reported in her initial police report.

The Government argues that the Petitioner mischaracterizes the Singapore court's findings, which only found that Ms. Bass embellished her account.  The Government also argues that the Petitioner has not shown how this testimony could have affected the outcome of the trial because the victims did not identify the Petitioner as the assailant.

The Court finds that the Petitioner has failed to establish that his counsel was ineffective in handling the victim's credibility.  The defense's theory of the case was that the Petitioner was not involved in the home invasion but Michael Kennedy

was.  This was a reasonable defense strategy because there was ample evidence—based on victim reports and evidence found at the scene of the crime—that the invasion occurred and that Michael Kennedy was involved—based on the spotting of his vehicle near the Bass property and his purchases prior to the invasion.  I

The decision not to try to impeach the victims' testimony about the invasion was strategic.   A jury is not likely to find persuasive an attorney who attacks every piece of evidence or badgers a victim about matters of little consequence.   The Petitioner fails to show how impeaching the victims on these small details could have changed the outcome of the trial, particularly since they did not identify him as one of the home invaders and there was ample evidence to corroborate their testimony the invasion happened.

Further, contrary to the Petitioner's claim, defense counsel did elicit testimony from Ms. Bass that she did not tell law enforcement about her observation of piercing blue eyes in her report on the invasion.  Tr. at 1129.  Thus, his argument fails because it is factually incorrect.

The Court finds that the Petitioner has failed to show that his defense team was ineffective in the way they addressed the victims' credibility.

F. <u>Failure to Call Witnesses</u>

In addition to the experts and witnesses that the Petitioner argues the defense should have called as discussed above, the Petitioner also makes the following arguments relating to other witnesses that he believes the defense should have called.  First, the Petitioner argues that the defense should have called a witness to present testimony about the issues with Jana Goloba.  Second, the

Petitioner argues that the defense should have called an expert witness to testify about the insignificance of the cell phone 'ping' data.  Third, the Petitioner argues that defense should have called witnesses to present medical records to either corroborate or impeach Ms. Bass's claim of bruising on her arm.  Fourth, the Petitioner argues that the defense failed to call alibi witnesses because it missed the deadline for disclosure.  Fifth, the Petitioner argues that the defense should have called a military expert.

The Government argues that all of these arguments fail for several reasons but the common reason amongst them being that the Petitioner does not state what these witnesses would have testified about and how such testimony would have been helpful to his defense.  First, the Government argues that the Petitioner has pointed to no evidence showing what testimony would have been elicited from Ms. Goloba and Mr. Kuhn would have established that Ms. Goloba was involved in the invasion.  Second, the Government argues that the cell phone tower witness it called was not an expert, he was a lay witness and the jury was to draw their own conclusions from his testimony.  Third, the Government also argues that even if there was a witness who would testify about Ms. Bass's medical records, her bruising was not an element of the offense or a sole basis for the sentencing enhancement for violence.  Fourth, the Government argues that his mother's alibi affidavit was made after the fact and there is no evidence the ex-wife would have been an alibi witness, rather there is evidence supporting the contrary.  Fifth, the Government argues that the Petitioners reference to a military expert is both unclear and unsupported by evidence showing such testimony would be relevant.

The Court finds that the Petitioner has failed to establish how his defense was ineffective in failing to call certain witnesses.  With respect to the witnesses who could have testified about Ms. Goloba's possible involvement, the Petitioner has provided no evidence that witnesses would have testified to that effect.  There is nothing in the record that provides a basis for concluding that Ms. Goloba was involved or that a witness would have testified to that effect.   His claim of ineffectiveness is vague and not rooted in any factual basis.

With respect to the cell phone tower witness the Petitioner argues the defense could have called, this argument fails to state what such witness would have said and why that would have been beneficial to his defense.  Attorney Felsen attests in her affidavit that she explored this option and determined it "would further implicate the defendant and draw attention to the fact that he was in the general vicinity of a location associated with this offense during the time period in question."  Felsen Aff. at ¶ 8.  At the evidentiary hearing, the Petitioner did not question Attorney Felsen as to whether this statement was accurate.  The decision not to call a cell phone tower witness was reasonable trial strategy.

With respect to the medical records witness the Petitioner argues the defense should have called, this argument also fails to state what such witness would have said and why that would have been beneficial to the defense.  Ms. Bass testified that she had bruising following the home invasion.  Whether such bruising is reported in her medical records does not prove that she did not have such bruising.   Further, whether Ms. Bass bruised was of no consequence to his conviction because injury is not an element of his charged offense conduct.  As it

45

relates to sentencing, it doesn't matter if Ms. Bass was injured due to the blue liquid, the injection, or just being roughly handled during the invasion.  The decision not to question whether Ms. Bass bruised and the cause of the bruise was reasonable trial strategy because it simply would have been an unnecessary waste of time and a possible basis for the jury to look dis-favorably on the Petitioner for unnecessarily victimizing a victim.

With respect to the alibi witnesses—his mother and his ex-wife—the Petitioner argues should have been called, this argument fails because the Petitioner has not shown that either witness was an alibi witness, able to provide a credible alibi for the Petitioner the night of the home invasion.  An alibi witness is someone who can testify that an accused was somewhere other than the scene of the crime when the crime was committed.  The Petitioner's ex-wife testified that "[m]ost of the times [she] wasn't home" and when she was home she was home between 2:00AM and 7:00AM.  Tr. at 979.  The reliance on the defense investigative report is misguided because the Petitioner's ex-wife never stated that the Petitioner was home on the night of the invasion; rather she said "she didn't remember" him not being home and "as far as she can recall" the Petitioner was sleeping.  Def.'s Ex. A-6.  This is not an alibi because it is equivocal.  It invites the cross examiner to ask the witness to confirm she does not know if the accused was home on the night in question. An affirmative answer to that question would undermine any benefit from calling the witness to offer an alibi.  Attorney Felsen's decision not to call the Petitioner's wife would be sound litigation strategy.

In addition, the affidavit from Doina Nicolescu, the Petitioner's mother, was created three years after the trial.  There is no evidence this alibi evidence was available at the time of trial, that Ms. Nicolescu would have testified to the same effect at trial, nor is there proof this testimony would have been found credible.  It is unreasonable to think that the Petitioner's mother could state where he was in the middle of the night.  It is also questionable that she could remember where the Petitioner was on an otherwise unremarkable Sunday in April five years prior. This testimony would have been fodder for effective cross examination as the recent fabrication by a bias witness.  Even if it was available, it would be an effective strategy not to present such impeachable testimony.

Finally, with respect to the military expert the Petitioner argues should have been called, this argument also fails because it is entirely specious.  The only evidence at trial about the "military" was Ms. Bass testimony that the home invaders charged at her "almost like they were in some kind of military formation or something."  Tr. at 1037.  This was a layperson's description not an expert opinion.  The Petitioner does not state what such an expert would have said, how it would have been helpful to his defense, or even how it would have been relevant at trial.  Moreover, once again, since she did not identify him, discrediting her description of the way the home invaders moved is useless. There is ample evidence the home invasion occurred.  The Petitioner has failed to show how the victim's credibility about  how  the home invaders did or  did  move could be impeached and, even if it could have been, how impeachment of that testimony could have altered the outcome of the trial.

Therefore, the Petitioner has failed to prove ineffective assistance of counsel with respect to the witnesses he claims the defense team should have called.

## G. Failure to Ask Questions and Make Arguments to the Jury

In addition to the many pieces of evidence that the Petitioner claims the defense team should have presented, the Petitioner makes the following additional general arguments. First, he argues that the defense team, failed to combat allegations that the Petitioner fled the country. Second, the Petitioner argues that the defense team, failed to present evidence that Mr. Lethbridge did not immediately report to the police following the invasion that he heard a walkie-talkie. The Petitioner argues that the defense team, should have presented evidence that there was cell phone reception at the Bass property, which would have combatted the Government's theory that someone who had been at the property must have tipped Kennedy off to buy walkie-talkies. Third, the Petitioner argues that the defense team failed to show that the alarm being disabled, broken, or tampered with was evidence that the invasion was an inside job. Fourth, the Petitioner argues that the defense team failed to present evidence from witnesses who claimed to have observed the individuals who dropped off the Jeep and said the individuals appeared to be Mexican.

The Government argues that the defense did combat the flight evidence during the trial. The Government further argues that multiple witnesses testified to the poor cell phone reception at the property and there is no evidence stating otherwise. The Government argues that there was evidence at trial that the alarm was not broken or tampered with, rather it was routinely off when Ms. Bass was at

48

the property.  Lastly, the Government argues that the reference to seeing people who appear Mexican is baseless.

The Court finds that the Petitioner has failed to establish his counsel was deficient in failing to raise these additional theories at trial.   Contrary to the Petitioner's motion, defense counsel did combat the flight evidence during the trial. During the opening statement, counsel stated that the Petitioner was not fleeing because he was still cooperating while overseas and that he returned to the country on his volition.  Tr. at 32–33.  During closing statements, defense counsel stated:

> Manny Nicolescu did not flee. September 23, 2010, manny had a great job, he had a fiancee, he was happy and had a good life, and he was at work when police officers came out in force, they took a swab of his DNA. And as you heard, he voluntarily talked to police at length. And he left the country and he contacted police. And there was no warrant out for him. And he came back using his name, bought a ticket, went to Chicago, he returned to Chicago, and his fiancee lives in Chicago, and that was the day they got the warrant. Manny did not flee.

Tr. at 1399–1400.  Thus, the defense team did combat the flight evidence and the Petitioner's argument is factually wrong.

The Petitioner has not shown how evidence that Mr. Lethbridge did not report hearing the walkie-talkies during his initial police interview would have influenced the outcome.  There is no evidence that Mr. Lethbridge lied or otherwise fabricated this evidence.  Defense counsel had already minimized the effect of the walkie-talkie testimony by eliciting testimony that what Mr. Lethbridge heard was the crackling of the baby monitor.  Tr. at 185.  Even if the jury was to discredit Mr. Lethbridge's walkie-talkie observation, there is ample other evidence connecting the Petitioner to this offense.

The Petitioner also has not shown what evidence there is that the Bass property had better cell phone reception than that to which the Bass employees testified.  Tr. at 218 (Chef Carole Wilson), 798–99 (General Manager Paul Kuhn); 839 (Housekeeper Maria Lukich).  He cannot show how his defense team was deficient because he has not shown what they should have set forth and how it could have changed the outcome.

The Petitioner's argument relating to the home alarm system is contrary to the ample trial testimony showing that the alarm was not broken or tampered with, rather it was routinely turned off when Ms. Bass was at the property and this was known by her staff.  Tr. at 837, 1015.

Finally, the Petitioner's argument relating to eyewitness accounts is entirely baseless.  Nothing in the record refers to or provides the Court with any information from which to infer what the Petitioner is talking about.  The Petitioner cannot meet his burden of proof by pointing to factual claims with no support whatsoever.

Therefore, the Petitioner has failed to prove ineffective assistance of counsel with respect to the additional questions and arguments that he claims the defense team should have made.

### H. Failure to Object to Jurisdiction

The Petitioner argues that Attorney Felsen failed to object to federal jurisdiction as to counts one and two.  The Government argues that this claim is false because Attorney Felsen did move to dismiss the case on this ground prior to trial.

Attorney Felsen did file a motion to dismiss arguing that "the crime charged involves a home invasion and attempted robbery of two private individuals, without a jurisdictional nexus apparent from any of the discovery materials other than the fact that one of the victims is extremely wealthy."  Dkt. 94.  Thus, Attorney Felsen challenged jurisdiction and the Petitioner's claim is factually incorrect.

Even if Attorney Felsen did fail to challenge jurisdiction, Petitioner was not prejudiced because jurisdiction was challenged and upheld on appeal.  The Petitioner could not establish prejudice in light of the Second Circuits finding of sufficient evidence for jurisdiction.

Therefore, the Petitioner has failed to prove ineffective assistance of counsel with respect to the failure to object to jurisdiction.

I. *Brady* Material

The Petitioner argues that Attorney Felsen failed to obtain all *Brady* material. The Government argues that the Petitioner's allegation is passing and nonspecific. The Court agrees with the Government.  The Petitioner merely states that Attorney Felsen failed to obtain all *Brady* material and nothing further.  The Petitioner cannot meet his burden of proof with unspecified wholly speculative allegations. Therefore, the Petitioner has failed to prove counsel was ineffective for failing to obtain unidentified *Brady* material.

J. Post-Trial Motions

The Petitioner claims that Attorney McMahon's post-trial motions "speak for themselves as inadequate and an example of ineffective assistance of counsel." The Government argues that the Petitioner's claim does not provide what about the

motion he believes is deficient.  The Court agrees with the Government.  The Petitioner has the burden of proof here.  He cannot meet that burden by pointing to an entire motion and saying the whole thing is deficient but not stating why.  His vague and conclusory allegations do not establish ineffective assistance of counsel.

Regardless, the Petitioner cannot establish prejudice.  The post-trial motion focused on the lack of jurisdiction, which based on the Court's review of the very voluminous record was his best defense to avoiding counts one and two in this case.  The lack of jurisdiction was raised and rejected by the trial court twice— during pre-trial motions and post-trial motions—and by the Second Circuit.  Meaning, the post-trial motion was going to fail because the facts simply did not support it, not because counsel was defective in any way.  Thus, even if counsel's performance was defective, the result of the case would not have changed.

Petitioner has failed to prove ineffective assistance of counsel with respect to the post-trial motions.

K. <u>Sentencing</u>

The Petitioner makes three arguments relating to ineffective assistance of counsel at sentencing.  First, the Petitioner argues that Attorney McMahon failed to file a motion for transfer even though he knew that the "judge's physical condition was too weak and too ill to conduct a fair sentencing hearing."  Second, the Petitioner argues that Attorney McMahon compounded the errors of Attorney Felsen by failing to bring in evidence at sentencing to address the evidence he claims was lacking at trial.    Specifically, the Petitioner argues that Attorney

McMahon should have sought medical records about Ms. Bass's bruising.  Third, the Petitioner argues that Attorney McMahon failed to argue about the application of § 2X1.1 at sentencing.

The Government argues that the Petitioner does not allege, nor is there anything in the record showing that Judge Kravitz's condition impacted his sentencing of the Petitioner.  The Government also argues that the Petitioner's claims about presenting additional evidence at sentencing is nonspecific and the only specific reference, to bruising, was of no consequence.  Lastly, the Government cites to the Second Circuit's decision on the Petitioner's direct appeal finding that application of § 2X1.1 had no effect on the sentencing range and thus the failure to argue said application was not prejudicial.

The Petitioner has failed to establish ineffective assistance of counsel at sentencing.  The Petitioner has not alleged any prejudice from counsel's failure to move to transfer.  Nothing in the record shows that Judge Kravitz was materially impaired or less than thorough in sentencing the Petitioner.  The fact that the 3-judge panel of the Second Circuit upheld his rulings attests to his high qualification to preside.

The Petitioner has also failed to show what evidence his counsel should have presented to counter the evidence of Ms. Bass's bruising, and more importantly, why that matters.  Whether Ms. Bass was bruised or even discolored by the injection of a blue liquid into her arm or marred by being roughly handled would not have had an impact on sentencing.

The Petitioner has also failed to allege how the application of § 2X1.1 would have changed the outcome of sentencing; nor could he allege such prejudice based on the Second Circuit decision that "even if the court should have applied § 2X1.1, this error would not have had an effect on the sentencing range." *Nicolescu*, 541 Fed. Appx. at 99.

Therefore, the Petitioner has failed to prove ineffective assistance of counsel with respect to sentencing.

### L.  Appeal

The Petitioner argues that Attorney McMahon was ineffective based on the arguments that the Petitioner had to raise on his own in a supplemental pro se brief.  The Petitioner argues that Attorney McMahon did not argue the Second Circuit Appeal, rather counsel the Petitioner hired after Attorney McMahon did.  The Government has not directly responded to this argument.

The Petitioner cannot establish deficient performance in failing to raise these claims because it was reasonable for appellate counsel to not raise claims that would ultimately fail.  This case, the claims that the Petitioner raised did fail. Further, the Petitioner cannot allege prejudice because the arguments he wanted raised were raised.  Finally, the Petitioner's statement that a different attorney had to argue the appeal does not establish how he was prejudiced. His incarceration was not extended, nor does he allege any other injury. He has not shown that counsel who did argue the appeal was underprepared or otherwise ineffective.

Therefore, the Petitioner has failed to prove ineffective assistance of counsel with respect to his direct appeal.

IV.     MOTION FOR DISCOVERY

The Petitioner filed a motion for discovery requesting, *inter alia*, access to defense counsel, the Governments, and law enforcement's files, along with the appointment of several experts relating to the evidence presented in this case.  The Government objected.

"A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course."  *Bracy v. Gramley*, 520 U.S. 899, 904 (1997).  Rule 6 of the Rules Governing Section 2254 and 2255 Cases provides that: "A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery. . . . (b) A party requesting discovery must provide reasons for the request."   Discovery requests that are mere fishing expeditions or a desire to "determine whether the requested items contain any grounds that might support [a] petition" do not satisfy the good cause standard.  *See Charles v. Artuz*, 21 F. Supp. 2d 168, 1701 (E.D.N.Y. 1998).   "Generalized statements regarding the possibility of the existence of discoverable material cannot yield 'good cause.' The court may, in its discretion, deny discovery where the petitioner provides no specific evidence that the requested discovery would support his or her habeas corpus petition."  *Abdi v. Duke*, 292 F. Supp. 3d 592, 594 (W.D.N.Y. 2017).

The Court has grouped the Petitioner's discovery requests and addresses each below.

A.  Plea Offer Materials

First, the Petitioner seeks any and all information in defense counsel and the Government's files relating to plea offers made and received.  The Government argues that because it never made such an offer, discovery on this matter would be futile.

The Court finds the Petitioner has not set forth good cause because there was no plea offer and thus nothing to discover.   Petitioner has everything there is related to a plea offer.  He has the *Pimentel* letter, which expressly states there was no plea offer.  Attorney Felsen has sworn that after she received the *Pimentel* letter, she did not secure an offer at the Petitioner's insistence in order to preserve the attorney-client relationship.  Thus, there is nothing to discover and entertaining this further simply enables an impermissible fishing expedition.

## B.  Defense Counsel's Expert and Investigative Reports

Second, the Petitioner seeks access to any and all information in defense counsel's files relating to expert witnesses and investigative reports.   The Government argues that discovery of this information would be futile because Attorney Felsen's affidavit outlines the expert she consulted with and provides her notes related thereto.  Further, the Government argues that the Petitioner has not pointed to credible evidence about what an expert would have testified to that would not have further incriminated him.

The Court finds that the Petitioner has not set forth good cause entitling him to access to this information.   Attorney Felsen's affidavit and its supporting exhibits contained details about what experts she relied on and their discussions. *See* Felsen Aff. at ¶¶ 6, 8, Ex. C, Ex. D.  In other words, this information has been

56

provided to the Petitioner.  Any further information would simply amount to a fishing expedition because the Petitioner has not made even conclusory allegations that would provide what this information contains—and most importantly—why this information is relevant to the Petitioner's defense.

Therefore, the Petitioner's request for defense counsel's records of expert witnesses and reports is denied for failure to state good cause.

C. Goloba Materials

Third, the Petitioner seeks access to police reports relating to the interviews with Jana Goloba.  The Government argues that the Petitioner has not shown how this evidence would have been admissible at trial or how this information could have contradicted any witnesses.

The Court finds that the Petitioner has not set forth good cause entitling him to access to this information.  The Petitioner has provided no specific evidence that would show how the evidence relating to Goloba is relevant here.

Therefore, the Petitioner's request for information relating to Goloba is denied for failure to state good cause.

D. DNA Lab Impeachment Materials

Fourth, the Petitioner seeks evidence from the parties' files, the State of Connecticut, and the Department of Public Safety showing that the DNA lab is unreliable.  The Government argues that this information is irrelevant and that this information is available to Petitioner online. The Government has even assisted Petitioner by providing a link to access the information readily.   The Petitioner has not set forth good cause for the Court to order production of this information.  This

information is available to the Petitioner.  The Petitioner's request for publicly available DNA information is denied for failure to state good cause.

### E.  Bass/Lethbridge Hospital and Impeachment Materials

Fifth, the Petitioner seeks to subpoena hospital records for Ms. Bass to prove she was not injured during the home invasion and access to the police reports that could impeach Ms. Bass and Mr. Lethbridge.  The Government argues that the Petitioner offers nothing to show such evidence exists or how those discrepancies would have affected trial.  The Government also states that the photographs of the bruise, one of which was taken at the hospital, clearly establish such bruise existed.

The Court finds that the Petitioner has not set forth good cause entitling him to access to this information.  The defense's reasonable theory of the case was that the Petitioner was not criminally involved in the home invasion.  This theory conceded the existence of the home invasion.  Conceding the home invasion was reasonable here because the victims and witnesses do not directly incriminate the Petitioner and there is ample evidence to support it and nothing to refute it on the record.   Meaning, impeaching Ms. Bass and Mr. Lethbridge would not have changed the outcome of the case in any way.  Further, as stated in greater detail above, whether the medical records reflect the cause of Ms. Bass's bruising is also not likely to have influenced the outcome.  Thus, the information is not relevant or necessary for the adjudication of this habeas case.

The Petitioner's request for medical records and material to impeach Ms. Bass and Mr. Lethbridge is denied for failure to state good cause.

F. *Brady* Materials

Sixth, the Petitioner seeks access to defense counsel, the Government, and law enforcement's files to determine if any *Brady* material is contained therein.  The Government argues that the Petitioner has set forth no evidence that such material exists.

Petitioner has not set forth good cause entitling him to access to this information.  He has provided no specific or even generalized evidence showing that such information exists and whether such information is relevant to his defense.  He has provided nothing that shows the Government wrongfully withheld information during his trial that would support a conclusion that *Brady* material exists here.  He is simply seeking to engage in a fishing expedition, which this Court will not authorize.  Petitioner's request for supposed *Brady* material is denied for failure to state good cause.

G. Frequency Ratios Admissions

Seventh, the Petitioner seeks a court order for the DNA lab to address the frequency ratios applied were not likelihood ratios.  The Government did not directly respond to this request, rather addressed it more generally in arguing that the Petitioner has not shown any expert would indicate a deficiency in the evidence.

The Petitioner has not set forth good cause to access this information.  In essence, the Petitioner is asking to the DNA lab to admit facts dictated by the Petitioner and to conduct analyses on behalf of the Petitioner.  This is not discovery.  Nor has the Petitioner shown good cause to require the production of

such information if it already existed. The Petitioner's request for admission against the DNA lab is denied for failure to state good cause.

### H. Retention of Various Expert Witnesses

Eighth, the Petitioner next asks the Court to retain experts to: review the hunting knife evidence, to review the Home Depot surveillance video, to review the Cadillac identification evidence, to review the authenticity of the 'home invasion kit,' and to review the cell phone tower evidence.  The Government argues that even if the Petitioner was able to find an expert who would opine that the vehicle in the video was not a Cadillac it would not have an effect on the outcome because the surveillance video evidence was corroborated but several other pieces of evidence, including the EZ pass records, the DNA evidence, and the cell phone data evidence.  The Government argues that the Petitioner has not articulated what a hunting knife expert would testify to that could impeach the identification of his ex-wife and his former father-in-law, the person who made the knife.

The Petitioner has provided no evidence, or even a rational argument, tending to establish that any of the experts he seeks could provide relevant and beneficial evidence.   The Petitioner's request is denied for failure to show good cause.

### V.    MOTION TO SUBPOENA ALEXANDRU NICOLESCU AND DETECTIVE PETER PINELLI

The Petitioner filed a motion seeking to depose or to subpoena Alexandru Nicolescu and for a subpoena against Detective Peter Pinelli.  Dkt. 91.   The Petitioner sought the introduction of evidence through these two individuals to prove that the Government gave Attorney Felsen a plea offer that she failed to

convey to him.  The only specific evidence supporting this theory was an affidavit from Alexandru that stated he was told by Special Agent Russell Day that the offer Alexandru was being offered was an offer also made to the Petitioner.  Mot. at Ex. E.  The Court stated on the record and reiterates here that the testimony relating to whatever law enforcement told Alexandru was not helpful to the Court's determination whether an offer was ever made in this case because law enforcement can and do lie to defendants and there was no reason to believe that what Alexandru was told, even assuming it is true, would prove that a plea offer was made in this case.  This is particularly so because there was uncontroverted testimony from Attorney Felsen and AUSA Novick that no plea offers were ever made in this case.  *See supra* Part III.A.

The Court denies the Petitioner's motions to subpoena Alexandru Nicolescu and Detective Pinelli.

## VI.    CONCLUSION

For the aforementioned reasons, the Court denied the Petitioner's § 2255 motion; Dkt. 1; motion for discovery; Dkt. 2; and motion to subpoena Alexandru Nicolescu and Detective Pinelli; Dkt. 91.  The Clerk is directed to close this case.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge


Dated this day in Hartford, Connecticut: March 10, 2021

61